# EXHIBIT 1

Joseph Flamini

## Page 1

SHARMAIN LEWIS        :COURT OF COMMON PLEAS
        Plaintiff    :PHILADELPHIA COUNTY
                        :
    VS.                :
                        :
                        :
NATIONAL BOARD OF    :
OSTEOPATHIC MEDICAL  :
EXAMINERS, INC.      :
        Defendant    :
            - - -

        Oral deposition of JOSEPH FLAMINI, was taken pursuant to notice via Zoom, on Tuesday November 10, 2020, beginning at or about 10:30 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public, there being present.
            - - -

        KAPLAN, LEAMAN AND WOLFE
        Registered Professional Reporters
        230 South Broad Street, Suite 1303
        Philadelphia, Pennsylvania 19102

## Page 2

1   APPEARANCES:
2
3       STEIN & VARGAS
        BY:  MARY VARGAS, ESQUIRE
        10 G Street, N.E., Suite 900
4       Washington, DC 20002
        Phone:  (202) 248-5092
5       Representing the Plaintiff
        mary.vargas@steinvargas.com
6
7
        KROGER, GARDIS & REGAS
8       BY:  SYDNEY STEELE, ESQUIRE
        111 Monument Circle, Suite 900
9       Indianapolis, IN  46204
        Phone:  (317) 692-9000
10      Representing the Defendant
        ssteele@kgrlaw.com
11
12
        LAW OFFICES OF CHARLES WEINER
13      BY:  CHARLES WEINER, ESQUIRE
        501 Cambria Avenue
14      Bensalem, PA. 19002
        Phone: (267) 685-6311
15      Representing the Plaintiff
        Co-Counsel
16      charles@charlesweinerlaw.com
17
18      ALSO PRESENT:
        DOUG MURRAY, ESQUIRE
19
20
21
22
23
24

## Page 3

1                   - - -
2               I N D E X
3                   - - -
4   JOSEPH FLAMINI          PAGE
5   BY MS. VARGAS           5,161
6   BY MR. STEELE           150
7                   - - -
8           E X H I B I T S
9
10  EXHIBIT NO.     DESCRIPTION         PAGE
11  Flamini-1   Notice of Deposition   13
12          Of Joseph Flamini
13  Flamini-2  Declaration of Joseph Flamini,  17
14          Lewis v. NBOME
15  Flamini-3   Bulletin of Information   21
16  Flamini-4   Settlement Agreement    65
17  Flamini-5  Declaration of Joseph Flamini  67
18          (Bahl litigation)
19  Flamini-6   Transaction Report     115
20  Flamini-7   Request For Test       123
21          Accommodations Instructions
22
23
24

## Page 4

1       MR. STEELE:  I want to be sure
2   that you have on the record the statement that
3   I made before you swore in the witness.
4   This deposition by agreement is limited to
5   matters pertaining to the Motion to Transfer,
6   but it doesn't preclude Plaintiffs from
7   further depositions of the witness unrelated
8   to the Motion to Transfer.
9       Number two, we do object to the
10  Request For Production of documents not in
11  compliance with Rule 34(b)(1) and (a)(2), that
12  nonetheless we did reference Exhibit-A and
13  Exhibit-B through Mr. Flamini's declaration.
14      And that we, of course, reserved
15  all objections regarding relativity of the
16  questions.
17                  - - -
18      THE REPORTER:  Before I swear in
19  the witness, I will ask counsel to stipulate
20  on the record that due to the current national
21  emergency pandemic, the court reporter,
22  myself, may swear in the deponent, and that
23  there in no objection to that at this time,
24  nor will there be an objection to it at a

                                1 (Pages 1 to 4)

Joseph Flamini

| Page 17 |
| --- |

1  A.  No.
2  Q.  If we scroll down to Exhibit-B, which I
3  believe begins on page 11 of 19.
4         MS. VARGAS:  Let's go ahead
5  and mark this as Exhibit-2.
6         - - -
7  (Whereupon, Exhibit Flamini-2 was marked for
8         identification.)
9         - - -
10        MR. STEELE:  Are you referring
11  to the whole declaration?
12 BY MS. VARGAS:
13  Q.  The whole declaration, yeah.
14        Looking at what I believe
15  is -- starting on page 11 of 19, a student who
16  was registering for the COMLEX on NBOME
17  website, would they see everything that
18  appears on page 11 of 19?
19  A.  Yes, they would.
20  Q.  Would they see the red arrow pointing?
21  A.  No.
22  Q.  Would they see the words where the red
23  arrows originates?
24  A.  No, you're referring to this tab that

| Page 18 |
| --- |

1  allows candidates -- no, they would not see
2  that.
3  Q.  Would they see the text that is at the
4  top of the page beginning, The NBOME Exam
5  Purchase Process, and ending with screen 1?
6  A.  No.
7  Q.  So a medical student registering for a
8  COMLEX, is this what they would have seen when
9  they registered?
10  A.  They would have seen everything that
11  captures the screenshot that begins with the
12  NBOME logo.  They would not see the arrow that
13  points down or the comment next to it, but
14  they would see everything else below the NBOME
15  logo.
16  Q.  What was the date of this screenshot?
17  A.  I am not sure that I have that date.  I
18  do not have that date.  That date was captured
19  in the last three months.  This screenshot was
20  captured in the last three months.
21  Q.  This is since July 2020?
22  A.  Yes.
23  Q.  So a student registering for NBOME prior
24  to July 2020 would not have seen this exact --

| Page 19 |
| --- |

1  this is not the exact screen they would have
2  seen?
3  A.  I believe it is.  I don't know about the
4  word exact, but it is extremely similar.  The
5  system has not changed significantly in any
6  way over those years.
7  Q.  I guess what I am saying is, what we see
8  at page 11 is not the same thing that a
9  student would have seen in 2017?
10  A.  If you take it to the exact precision
11  that every single font and everything is
12  exact, then the answer to that is you're
13  correct.  They may not have seen, but I will
14  tell you that the system has been in place and
15  has been virtually this, almost identical, and
16  perhaps identical over those years.  They
17  would have seen the same thing.  We have not
18  made dramatic changes.
19  Q.  Substantively, what we see on page 11 of
20  this exhibit is not what a student would have
21  seen in 2017?
22  A.  Correct.  Substantively, they would have
23  seen the same screen.
24  Q.  In 2017, you would have told students

| Page 20 |
| --- |

1  about COVID-19?
2  A.  No.
3  Q.  So it is not the same, right?
4  A.  That is true.  I am talking about the
5  structure of the page, the way a student comes
6  in and registers for an exam.
7  Q.  So is it fair to say that some of what
8  we see at page 11 is the same and some of it
9  isn't?
10  A.  Certainly, something like COVID-19
11  wouldn't be here.
12  Q.  We will come back to this later.  I
13  would like to stop this screen share.
14        What I have put on the screen
15  is titled, NBOME COMLEX USA Bulletin of
16  Information.
17        Do you have a copy of that
18  exhibit in front of you?
19  A.  I do.  Let me pull it out here.
20  Q.  It's rather lengthy.  I am happy to
21  scroll through on the screen, but I think it
22  might be easier for you if you have the
23  document in front of you.
24  A.  I have my document in front of me.

Joseph Flamini

Page 21

1  Q.  Can you explain to me what this is?
2  A.  This is the legal document that controls
3  the administration of our COMLEX USA series of
4  examinations.
5  Q.  The copy that I am showing on the screen
6  and that was provided to your counsel this
7  morning, is that the copy that you have in
8  front of you?
9  A.  It appears to be.  It's effective
10  7/1/2020.
11  Q.  Does this appear to you to be a true and
12  correct copy of the NBOME Bulletin of
13  Information?
14  A.  From what I can see so far, what you
15  have is what I have, so yes.
16       MS. VARGAS:  Let's mark this
17  as Exhibit Number 3.
18       - - -
19  (Whereupon, Exhibit Flamini-3 was marked for
20       identification.)
21       - - -
22  BY MS. VARGAS:
23  Q.  Mr. Flamini, can you explain to me what
24  this is?

Page 22

1  A.  What the document is?
2  Q.  Yes.
3  A.  This is the document that we used at --
4  it spells out all of the conditions for a
5  candidate to take the COMLEX USA series of
6  examinations, the four examinations that
7  comprise the series.
8  Q.  At the bottom of this page, can you
9  explain to me the two last lines of text, what
10  that means?
11  A.  The two lines of text?
12  Q.  Yes, the last two lines of the first
13  page.
14  A.  What mine reads is:  2020 to 2021 COMLEX
15  USA Bulletin of Information, effective July
16  1st, 2020.
17       So that line ensures the
18  candidate knows what version of the document
19  they're looking at.
20       The second line says, it's a
21  copyrighted document for the National Board of
22  Osteopathic Medical Examiners with all rights
23  reserved.
24  Q.  We talked about this a little bit

Page 23

1  before.
2       Is it fair to say then that
3  every year there is a different Bulletin of
4  Information?
5  A.  There are changes each year, format
6  and/or some substance.
7  Q.  Explain to me, how does a student
8  register with NBOME?
9  A.  How they register for our COMLEX USA
10  examinations?
11  Q.  Yes.
12  A.  They enter into what is known as our
13  CRS, which we call our portal.  That is not
14  our website.  Our website is probably where
15  you pulled this document, if you pull it down,
16  if you look at it.
17       It is the portal where
18  candidates enter, where deans enter, and where
19  administrators enter to look at registration
20  information.
21       The candidate would go into
22  that portal and create an account to register
23  for our exams.
24  Q.  Do students have to register before

Page 24

1  requesting accommodations?
2  A.  Yes.
3  Q.  Is it possible to request accommodations
4  without registering?
5  A.  No.
6  Q.  What would happen if a student requested
7  accommodations and they hadn't registered?
8  A.  My staff in accommodations would refer
9  them back to register for the exam prior to
10  any action taken with reviewing their
11  application for accommodation.
12  Q.  So at the time that a student registers,
13  they wouldn't know whether or not they would
14  be receiving accommodations that they might
15  request; is that right?
16  A.  That is true.
17  Q.  And is there any time limit that
18  candidates have between the time they register
19  and the time that they would, say, seek
20  accommodations?
21  A.  Any time -- can you be more specific?
22  Q.  Sure.  When a student registers, if they
23  are going to seek accommodations, do they have
24  to do that immediately?

Joseph Flamini

Page 25

```
 1      A.   No.  They could register and wait a
 2   period of time, and then apply for
 3   accommodations.
 4      Q.   How long could they wait?
 5      A.   There is no limit from the standpoint of
 6   accommodations.  If they wanted to wait
 7   several years, they could.  It is the reverse
 8   that when they come in and ask for the
 9   accommodation, we simply look to make sure
10   they are registered in our system.
11      Q.   Let me back up a little bit.  I don't
12   think we ever even talked about what your
13   official position is with the NBOME.
14           Can you tell me what your job
15   title is?
16      A.   Vice president for administration and
17   chief operating officer.
18      Q.   What are your responsibilities with
19   NBOME?
20      A.   Responsibilities include all things
21   legal, testing accommodations, facilities,
22   information systems, and marketing and
23   communications.
24      Q.   Where is your position based?
```

Page 26

```
 1      A.   In Philadelphia.  Excuse me, in the
 2   Philadelphia area.  Our office is in
 3   Conshohocken, Pennsylvania.
 4      Q.   Tell me a little bit about the
 5   Conshohocken office.
 6           Is that where the executive
 7   officers all are located?
 8      A.   Philadelphia is the home of the
 9   executive offices.  That means that the CEO
10   and myself are here.  Some of our vice
11   presidents are here, and as you probably know,
12   we have an office in Chicago where some of our
13   other staff are located.
14      Q.   What is the COMLEX?
15      A.   COMLEX is an examination which allows a
16   student to demonstrate their proficiency,
17   their knowledge, minimal competency to move
18   forward in their education, to graduate from
19   medical school.
20           And the third piece of the
21   examination, the Level 3, actually allows them
22   to get licensure in all 50 states in the
23   United States.
24      Q.   Does the NBOME license medical
```

Page 27

```
 1   professionals?
 2      A.   Never.
 3      Q.   Can a medical student graduate medical
 4   school without taking and passing COMLEX 1?
 5      A.   No.
 6      Q.   Can a medical student graduate medical
 7   school without taking and passing either of
 8   the COMLEX 2 tests?
 9      A.   I will just tell you that the answer to
10   that has been no.  There is an interim COVID
11   situation right now as we speak where the
12   accreditation council has allowed flexibility
13   in that for the COMs, but traditionally the
14   answer to that question is no, you cannot
15   graduate.
16      Q.   Just to be clear, the flexibility with
17   respect to COMLEX 2, is that with respect to
18   both COMLEX 2 tests?
19      A.   It is only the Level 2-PE examination.
20      Q.   Tell me about -- maybe if you could
21   explain the two different tests, that would be
22   helpful?
23      A.   There are a total of four examinations
24   in the COMLEX series:  Level 1, Level 2, CE is
```

Page 28

```
 1   another computer-based.  Those first two are
 2   computer-based exams.  Candidates go to
 3   testing centers and take those exams.  And
 4   Level 3 is another computer-based exam.
 5           The Level 2-PE is a clinical
 6   skills exam.  Students come to one of our two
 7   centers and run through a series of simulated
 8   encounters with patients, 12 encounters, and
 9   that is not computer-based.  That is an actual
10   onsite demonstration of proficiency.
11      Q.   A medical student even after COVID would
12   have to take and pass the COMLEX 1 and the
13   COMLEX 2-CE in order to graduate medical
14   school; is that right?
15      A.   That's correct.
16      Q.   Does anyone other than NBOME offer the
17   COMLEX 1 and 2?
18      A.   It depends.  You're asking that of
19   osteopathic students.  I'll just clarify that.
20           There is another organization
21   that you're probably aware of that does the
22   same thing we do for allopathic students, the
23   NBME.
24      Q.   I am very familiar.  Thank you.
```

7 (Pages 25 to 28)

Joseph Flamini

Page 29

1    A.  Osteopathic students must take our
2    examination in order to graduate.
3    Q.  I am only going to be asking about
4    osteopathic students today.
5           So for osteopathic students,
6    just to be clear, they have to take and pass
7    the COMLEX 1 and the COMLEX 2-CE in order to
8    graduate medical school.  And you're the only
9    game in town?  You're the only ones that offer
10   that exam?
11   A.  That's correct.
12   Q.  So then going back to when a student
13   registers with the NBOME for the first time,
14   walk me through what a student would have to
15   do in order to register?
16   A.  A student would come to our, what we
17   call portal, our client registration system,
18   and enter that information.
19          They would do that by coming
20   through our main website, and you enter in
21   some information to jump into our registration
22   system.
23          The page you showed on
24   page 11 of 19 is the screen that they would

Page 30

1    enter, and they would have to put in their
2    name, their passwords, their ID that they want
3    to be known as in the system.
4           Some of the information would
5    have been populated by their college of
6    osteopathic medicine, a couple of points, but
7    they have to go in and answer all of the
8    questions that are there, all of the blank
9    fields, the address that they want, ZIP Codes,
10   and then in order to register, they would need
11   to agree to the terms and conditions that are
12   part of the Bulletin of Information.
13   Q.  Is there an option for a student to
14   alter those terms?
15   A.  No, there is not.
16   Q.  Is there an option that allows a student
17   not to agree to those terms?
18   A.  There is an option that says, if you
19   have questions, you may call this number, but
20   if you do not agree to those terms, you cannot
21   complete your registration process.
22   Q.  Can you take the COMLEX without
23   completing the registration process?
24   A.  No.

Page 31

1    Q.  Can you request accommodations without
2    completing the registration process?
3    A.  No.
4    Q.  Is it fair to say that if a student
5    doesn't agree with the terms the NBOME lays
6    out, that they cannot become a doctor?
7    A.  They cannot take our exam -- they cannot
8    complete our examination to become a doctor,
9    that is true.
10   Q.  At what point in a student's medical
11   career do they typically register with the
12   NBOME for the first time?
13   A.  They register around the beginning of
14   their second year in med school.
15   Q.  Does that differ slightly for different
16   schools?
17   A.  I think there is some variation.  Some
18   of the schools look to have their students
19   test at different times, so then the
20   registration is slightly different.
21          Some schools are a little bit
22   more aggressive in terms of how early they
23   test, yes.
24   Q.  At the time a student first registers

Page 32

1    with the NBOME, they would at a minimum
2    already have completed their first year of
3    medical school, right?
4    A.  Yes.
5    Q.  Do you have any idea what the cost
6    generally is for each year of medical school?
7    A.  My knowledge is not based on each year,
8    but in total, I know a candidate will spend a
9    quarter million or more to complete the four
10   years of education.
11   Q.  At the time that a student enters
12   medical school, have they had an opportunity
13   to review the terms and conditions that you
14   were going to require of them in order to take
15   the COMLEX?
16   A.  Did you say, do they have the ability?
17   Q.  Has it been provided to them?
18   A.  Would you repeat that statement --
19   Q.  Sure, that was badly worded.
20          So does the NBOME contact
21   medical students prior to the time they start
22   medical school to let them know the terms and
23   conditions that they have to agree to if they
24   want to become a doctor?

8 (Pages 29 to 32)

Joseph Flamini

Page 33

1    A.   We do not contact potential medical
2 students in any way, no.
3    Q.   Looking back at Exhibit-3, which is the
4 Bulletin of Information, can you explain to me
5 how this factors into the registration
6 process?
7    A.   As you register for the exam, you have
8 the opportunity to review the Bulletin of
9 Information.  There is a link in the
10 registration process that connects you back to
11 the bulletin, and you get the full Bulletin of
12 Information.
13    Q.   How many pages is the Bulletin of
14 Information at Exhibit-3?
15    A.   I will take a quick look and see what my
16 document shows.  It reveals 45 pages.
17    Q.   So when a student registers, do they
18 have to review all 45 pages in order to
19 register?
20    A.   There is no requirement that they review
21 all 45 pages.
22    Q.   What do they have to review in order to
23 register?
24    A.   What's most important is the terms and

Page 34

1 conditions, which are displayed clearly in
2 front of them.  It's not just a reference to
3 the bulletin.  The actual terms and conditions
4 appear on the screen.  You don't have to go
5 search for it.  It is pushed right in front of
6 you.  And they must agree to those terms and
7 conditions, the first of which mentions the
8 full Bulletin of Information.
9    Q.   The terms and conditions that appear on
10 the screen, do you know what font those terms
11 and conditions appear in?
12    A.   I do not.  I cannot tell you the exact
13 font.
14    Q.   Is that something that you would be able
15 to find out when the deposition ends and let
16 your counsel know so they can get back to us.
17       MR. STEELE:  What is the
18 question?  The font of what?
19       MS. VARGAS:  The font of the
20 terms and conditions as they appear on the
21 screen.
22       THE WITNESS:  In the Bulletin
23 of Information?
24       MS. VARGAS:  Yes.

Page 35

1       THE WITNESS:  We can
2 certainly provide that.  I will tell you
3 again, recently I went through the process.  I
4 will tell you it is not what you see on some
5 websites that are very tiny, small print.
6 It's easy to read.  But yes, we can provide
7 you the exact font.
8 BY MS. VARGAS:
9    Q.   Looking on page 5 of the Bulletin of
10 Information, at the top of that page, it says,
11 Terms and Conditions, is this what you were
12 referring to a moment ago?
13    A.   Yes, it is.
14    Q.   So a student -- these terms and
15 conditions would appear on the screen for the
16 student?
17    A.   That's correct.
18    Q.   They would have to agree to these terms
19 and conditions in order to register with the
20 NBOME?
21    A.   That's correct.
22    Q.   There is no alternative?
23    A.   No.
24    Q.   They don't have any choice?

Page 36

1    A.   There is an option for if they have
2 questions about terms and conditions to get
3 more information, but eventually, in order to
4 register, you must agree.
5    Q.   And that option to ask questions, who
6 answers those questions?
7    A.   Those would come through, I believe, it
8 connects you to our client services, and that
9 would be my staff.
10    Q.   Where is your client services based?
11    A.   They are based in Chicago.  They are, I
12 should say, based both in Chicago and there is
13 some staff here in Philadelphia.
14 Conshohocken.
15    Q.   So it's fair to say that some of the
16 folks who answer those questions might be in
17 Pennsylvania?
18    A.   Yes.
19    Q.   Looking at page 5, I am going to ask you
20 to walk me through what each of these numbered
21 paragraphs -- if you could explain to me what
22 each of them provides, starting with paragraph
23 1?
24    A.   Paragraph 1, Bulletin of Information, is

9 (Pages 33 to 36)

Joseph Flamini

Page 49

1   Q.   What would that benefit be?
2   A.   Providing some limits to what actions
3   the student would take.
4   Q.   Would paragraph 7 release the NBOME from
5   liability for bad acts?
6   A.   I don't know that I would say that. I
7   need further definition of bad acts.
8   Q.   If the NBOME did something in violation
9   of law, would paragraph 7 release them from
10  liability for those violations of law?
11          MR. STEELE:  Objection.  You
12  haven't defined the term.  You haven't defined
13  what violation there may be.  It's highly
14  speculative.
15          THE WITNESS:  I am having
16  difficulty answering that because of that.  If
17  I had a specific example, perhaps I could.
18  BY MS. VARGAS:
19  Q.   Is it fair to say that it is difficult
20  to know what paragraph 7 actually means?
21  A.   No, I think there is a general sense of
22  what it means, but when you get into the
23  specifics, you certainly would need some
24  guidance.

Page 50

1   Q.   When you say, in a general sense, you
2   know what it means.
3          In a general sense, what does
4   it mean?
5   A.   I think it means, as it states here,
6   that they are releasing and discharging the
7   NBOME from prior acts and claims.
8   Q.   Does paragraph 7 explain how it applies
9   in individual circumstances?
10  A.   Again, in individual circumstances, you
11  have to be more specific.
12  Q.   Let's move on to paragraph 8.
13          What does paragraph 8 mean?
14  A.   Paragraph 8 summarizes that the Bulletin
15  of Information is governed and construed under
16  the laws and the State of Indiana.
17  Q.   Why does the NBOME want the Bulletin of
18  Information to be construed under the laws of
19  the State of Indiana?
20  A.   We provide examinations to students from
21  all over the country, you know, testing
22  centers all over the country, and it's to
23  provide some consistency that it's addressed
24  in one format that is possible for us to

Page 51

1   manage.
2   Q.   Why do you choose specifically that that
3   one format is Indiana, rather than someplace
4   else?
5   A.   Indiana is the state we're incorporated
6   in.
7   Q.   What do you have actually physically in
8   the State of Indiana?
9   A.   We don't have any physical facilities.
10          MR. STEELE:  Besides me.
11          THE WITNESS:  Our general
12  counsel.
13  BY MS. VARGAS:
14  Q.   Mr. Steele.  Is it fair to say he is
15  your outside counsel at the NBOME?
16  A.   Yes.
17  Q.   Where is your general counsel located?
18  A.   Here in Conshohocken office.
19  Q.   And that is Mr. Murray?
20  A.   That's correct.
21  Q.   Do you know where Mr. Murray is licensed
22  to practice law?
23  A.   In the State of Pennsylvania, I know he
24  is.

Page 52

1   Q.   Is he licensed to practice law in the
2   State of Indiana?
3   A.   I don't believe he is.
4   Q.   Are there any reasons other than the
5   ones you have mentioned why you choose Indiana
6   rather than, say, Pennsylvania?
7   A.   No, just centrally located in the United
8   States.  It's close to our Chicago office.
9   Q.   How far is Marion County from your
10  Chicago office?
11  A.   A couple hours, at most.
12  Q.   How far is the executive office of the
13  NBOME in Conshohocken from the U.S. federal
14  courthouse in Philadelphia?
15  A.   It depends on traffic.
16  Q.   How many miles?
17  A.   Seriously, I would say it's about
18  15 miles away, down the Schuylkill.
19  Q.   Is there a reason why the U.S. federal
20  courthouse in Philadelphia would not be
21  convenient for you?
22  A.   I think we have chosen Marion County.
23  It has been historical for us.  We have always
24  used that one site for consistency.

13 (Pages 49 to 52)

Joseph Flamini

| Page 65 |
|---|
| 1       MS. VARGAS:  I would like to |
| 2  have this marked as Exhibit-4. |
| 3       - - - |
| 4  (Whereupon, Exhibit Flamini-4 was marked for |
| 5       identification.) |
| 6       - - - |
| 7  BY MS. VARGAS: |
| 8  Q.   Can you tell me generally what the |
| 9  situation was between Mr. Bahl and the NBOME |
| 10  that resulted in this settlement? |
| 11  A.   Actually, it goes back several years to |
| 12  say the least.  I am just actually reading |
| 13  this section here to remind me, to refresh my |
| 14  memory. |
| 15       It involved him taking our |
| 16  Level 2 examination, and he breached his |
| 17  obligation to sue us in Indiana. |
| 18  Q.   Where did he file suit against the |
| 19  NBOME? |
| 20  A.   I must say, I do not recall the exact |
| 21  location. |
| 22  Q.   Do you recall what he filed suit for? |
| 23  A.   I do not.  I wouldn't want to guess.  I |
| 24  certainly remember the Ajay Bahl case in |

| Page 66 |
|---|
| 1  general terms.  I would need to refresh to |
| 2  answer your question. |
| 3  Q.   Do you recall if Ajay Bahl sought |
| 4  accommodations from NBOME for his COMLEX |
| 5  examinations? |
| 6  A.   I would be guessing to say to you, yes, |
| 7  so I don't want to say yes.  But I would want |
| 8  to refresh my memory on this particular case |
| 9  from several years ago. |
| 10  Q.   Did you complete declarations that were |
| 11  submitted to the court in the Ajay Bahl |
| 12  litigation? |
| 13  A.   I believe I would have.  I don't recall |
| 14  them in detail, though. |
| 15  Q.   I have shared a document that has a |
| 16  court stamp at the top, 42-2:  United States |
| 17  District Court for the Eastern District of New |
| 18  York.  John Doe v. New York College of |
| 19  Osteopathic Medicine, the National Board of |
| 20  Osteopathic Medical Examiners, and two other |
| 21  entities.  And it's titled:  Declaration of |
| 22  Joseph Flamini. |
| 23       Do you recognize this |
| 24  document? |

| Page 67 |
|---|
| 1  A.   I do, Mary.  Can you enlarge it a |
| 2  little? |
| 3       Yes.  Again, I am familiar. |
| 4  I couldn't spell out all of the details to you |
| 5  off the top of my head, but I am familiar. |
| 6  Q.   I am going to scroll down to the end. |
| 7       Is that your signature that |
| 8  appears on page 8? |
| 9  A.   Yes, it is. |
| 10       MS. VARGAS:  So if we can |
| 11  have this marked as Exhibit-5, please. |
| 12       - - - |
| 13  (Whereupon, Exhibit Flamini-5 was marked for |
| 14       identification.) |
| 15       - - - |
| 16  BY MS. VARGAS: |
| 17  Q.   Do you agree that it appears -- does |
| 18  this document refresh your recollection about |
| 19  the circumstances of Mr. Bahl suing the NBOME? |
| 20  A.   It begins to, but I would have to take a |
| 21  minute and read it.  You asked -- let me just |
| 22  take a look here.  I have just read 22 and 23. |
| 23       MR. STEELE:  What is the |
| 24  question pending? |

| Page 68 |
|---|
| 1  BY MS. VARGAS: |
| 2  Q.   I asked if this refreshed his |
| 3  recollection about what Mr. Bahl filed suit |
| 4  against the NBOME for? |
| 5  A.   As I read each section, I do recall. |
| 6  Q.   What was it about?  What was the case |
| 7  about, just generally? |
| 8  A.   It was about accommodation, and |
| 9  specifically, the Level 2-PE, asking for more |
| 10  time for a SOAP note. |
| 11  Q.   Is it accurate that Mr. Bahl is a |
| 12  medical student who filed suit about his |
| 13  request for accommodations that was denied in |
| 14  New York; is that accurate? |
| 15  A.   Yes. |
| 16  Q.   And then the NBOME moved to transfer Mr. |
| 17  Bahl's suit to Indiana; is that right? |
| 18  A.   Yes. |
| 19  Q.   After the transfer, did the NBOME then |
| 20  seek attorney's fees and costs from this |
| 21  medical student? |
| 22  A.   I recall we seeked a settlement with |
| 23  him, which that Settlement Agreement laid out. |
| 24  Q.   Let's go back to that.  So going back to |

**17 (Pages 65 to 68)**

Joseph Flamini

<table>
<tr><td>

Page 85

1   violated the Bulletin of Information?
2   A.   The NBOME would determine what she was
3   in violation of.
4   Q.   To be clear, I don't want to know about
5   anything you discussed, any conversations you
6   had with your attorney, I am asking for a very
7   discrete, simple fact.
8          What is hourly rate that the
9   NBOME pays its attorneys in disability
10   discrimination litigation?
11   A.   The hourly rate?  I would have to look
12   back at previous invoices to see what that
13   number was.
14   Q.   Do you have a sense of the ballpark
15   hourly rate?
16   A.   I would pick a number and say $200 an
17   hour.
18   Q.   Is there anywhere in the Bulletin of
19   Information where it advises students what the
20   hourly rates are for the attorneys at the
21   NBOME?
22   A.   Not to the best of my knowledge.
23   Q.   Is there any way a student would know
24   how much they were agreeing to pay in

</td><td>

Page 86

1   attorney's fees and costs if they were to file
2   somewhere other than Indiana?
3   A.   Repeat the question.
4   Q.   Is there any way a student like Ms.
5   Lewis -- let's just talk about Ms. Lewis -- is
6   there any way Ms. Lewis could know if she
7   filed a lawsuit in the Eastern District of
8   Pennsylvania rather than Indiana, how much she
9   would have to potentially pay for attorney's
10   fees and costs if the case was transferred
11   back to Indiana?
12   A.   I don't know that I can answer that
13   question.
14   Q.   Would you agree it is sort of a blank
15   check?
16   A.   No, but she would need to do some
17   investigation.
18   Q.   What kind of investigation could Ms.
19   Lewis do to find out Mr. Steele's hourly rate?
20   A.   She would probably contact her attorney
21   and ask them for guidance.
22   Q.   So she would have to have an attorney in
23   order to find out what liability this
24   agreement was subjecting her to?

</td></tr>
<tr><td>

Page 87

1          MR. STEELE:  That wasn't the
2   question.  The question was the attorney's
3   fees.
4          MS. VARGAS:  Right.
5          MR. STEELE:  Her attorney's
6   fees, she would need to get some guidance,
7   whether it is an attorney or not.
8   BY MS. VARGAS:
9   Q.   That information is not in the Bulletin
10   of Information, right?
11   A.   It is not.
12   Q.   Is there anything in paragraph 11 that
13   would benefit a medical student agreeing to
14   the Bulletin of Information?
15          MR. STEELE:  Other than
16   benefits of taking the exam?
17          THE WITNESS:  I think it is
18   taking the exam, and I think as I stated
19   already to ensure fairness in the exam, the
20   benefit to the student to know they're taking
21   a fair examination.
22   BY MS. VARGAS:
23   Q.   Can you explain how it benefits a
24   student to know that they will have to pay

</td><td>

Page 88

1   attorney's fees to the NBOME if they file suit
2   other than in Indiana?
3          MR. STEELE:  I'm sorry, I
4   thought you said paragraph 10.
5          MS. VARGAS:  Looking at
6   paragraph 11.
7          MR. STEELE:  I'm sorry, I
8   thought you said paragraph 10.  Could you
9   restate the question.
10   BY MS. VARGAS:
11   Q.   Making sure we're both talking about the
12   same thing, for paragraph 11, is there any
13   benefit to the medical student?
14   A.   Yeah, I think it states the same.  It is
15   the opportunity that a candidate must follow
16   the BOI, and that includes issues of fairness
17   and confidentiality.  That is a benefit to a
18   student, that I know that my examination is
19   fair.
20   Q.   In your opinion, does the NBOME and
21   medical students, do they have equal
22   bargaining power?
23   A.   I'm not sure what you even mean by that
24   question.  Do they have equal bargaining

</td></tr>
</table>

22 (Pages 85 to 88)

Joseph Flamini

Page 121

1  your request.
2  BY MS. VARGAS:
3  Q.   Mr. Flamini, does the NBOME have any
4  employees in Indiana?
5  A.   No.
6  Q.   At the time that Ms. Lewis requested
7  accommodations, was there anything to indicate
8  what, if any, terms and conditions she was
9  agreeing to?
10        MR. STEELE:  Would you read
11  the question back, please?
12        - - -
13  (Whereupon the Court Reporter read back the
14  testimony.)
15        - - -
16        THE WITNESS:  Again, similar
17  to this document, we would go back to the date
18  she requested, and be able to tell you what
19  the terms and conditions were at that time.
20  BY MS. VARGAS:
21  Q.   I am asking a different question.  I am
22  not asking what you could sort of track down.
23        I am asking from the
24  perspective of Ms. Lewis, at the time that she

Page 122

1  requested accommodations, was there anything
2  indicating what she was agreeing to in an
3  exchange for asking for accommodations under
4  federal law?
5  A.   I am not clear on what your question is.
6        MR. STEELE:  Let me object to
7  the form of the question.
8  BY MS. VARGAS:
9  Q.   Is there anywhere on the -- on a request
10  for accommodations that it specifies what
11  terms and conditions the medical student is
12  agreeing to or is that only on the
13  registration?
14  A.   I would have to look at the application.
15  The Bulletin of Information may specify that
16  also, but I do not know off the top of my
17  head.
18        MS. VARGAS:  If you wouldn't
19  mind turning off your screen share, because I
20  don't know if we can both do it at the same
21  time.
22  BY MS. VARGAS:
23  Q.   I put up on the screen a document
24  entitled NBOME, National Board of Osteopathic

Page 123

1  Medical Examiners, Request For Test
2  Accommodations Instructions.
3        Are you familiar with this
4  document?
5  A.   I am familiar, not in detail, but yes,
6  this is what she would click on to get
7  information.
8        Can you enlarge it a little
9  bit?
10        Yes, I recognize it, I don't
11  know every detail from it, but I recognize it.
12        MS. VARGAS:  Why don't we
13  mark this as Exhibit-7 -- or is it Exhibit-8?
14        - - -
15  (Whereupon, Exhibit Flamini-7 was marked for
16  identification.)
17        - - -
18        MR. STEELE:  Can the reporter
19  e-mail those to us?
20        MS. VARGAS:  Afterwards, I am
21  going to e-mail a complete set of everything I
22  have, so we're all clear on the same
23  exhibits -- after we all have the real
24  documents that were referenced.

Page 124

1        MR. STEELE:  Would that
2  include Exhibit-6 that I just e-mailed?
3        MS. VARGAS:  You will
4  provide -- you have -- you said you provided
5  to me -- I haven't gotten it yet in my e-mail.
6  So if I already got it, when this is done, I
7  will include that in the packet and provide
8  that to everyone.
9        MR. STEELE:  If not, let me
10  know no.
11        MS. VARGAS:  Okay.  Sounds
12  good.
13  BY MS. VARGAS:
14  Q.   Mr. Flamini, looking at page 1 of the
15  Request For Test Accommodations, of the
16  exhibit's page 2, because the first page is
17  the document cover sheet.
18        So if you look at what is
19  marked as page 1 on the document itself, if
20  you look at the last two sentences, anywhere
21  in the Eligibility to Apply For Accommodation,
22  does it say anywhere in there that a medical
23  student has to agree to terms and conditions
24  in order to seek accommodations?

**31 (Pages 121 to 124)**

Joseph Flamini

Page 125

1    A.   You are saying anywhere in the entire
2  sheet?
3    Q.   I guess we're going to have to make sure
4  you can read this.  I guess I could -- is the
5  best way to e-mail to you or do you want me to
6  scroll through it.
7    A.   Better if you e-mailed it.
8        MS. VARGAS:  I can hit reply
9  all.  I see I have now gotten that document
10  from you, Syd.  I see Mr. Flamini is in the
11  cc'd.  I want to be careful about
12  communicating with a represented party.
13        Do I have permission from you
14  to reply all with the document that we're
15  talking about?
16        MR. STEELE:  Yes.  You're
17  sending that document --
18        MS. VARGAS:  Yes, without
19  comment, I am sending you the document that is
20  on the screen.
21        My dogs are having a battle
22  in the hallway.  So excuse that.
23        MR. STEELE:  Do you have any
24  sense about how much longer it is going to go?

Page 126

1        MS. VARGAS:  I think like 20
2  minutes.
3        MR. STEELE:  I do have some
4  questions as well.
5        MS. VARGAS:  Okay.
6
7        MR. STEELE:  I know that the
8  witness can go a little beyond one, but we're
9  already at 1:30.
10        What are your thoughts?  Why
11  don't we go through this exhibit and then
12  we'll talk.
13        MS. VARGAS:  I think I am
14  almost done.
15        THE WITNESS:  You're asking
16  me about something that was contained here,
17  now that I have it in front of me, could you
18  repeat what --
19  BY MS. VARGAS:
20    Q.   Take a minute to look at it, and what my
21  question is going to be is, is there anywhere
22  in the Request For Test Accommodations
23  Instructions that it informs a medical student
24  that they are agreeing to any terms and

Page 127

1  conditions or Bulletin of Information at the
2  time that they are requesting accommodations?
3    A.   As I am reading through, on page 3,
4  Consideration Process, it indicates that
5  before request for test accommodations be
6  considered, you must complete, sign, and
7  submit the Request For Test Accommodations
8  application.
9        That application, when you
10  open that, says that I agree to the NBOME
11  terms and conditions set forth in the BOI.
12        So it is a requirement that
13  is linked to this document.
14    Q.   So I guess I don't have the document
15  you're talking about.
16        You're saying there's on the
17  application for accommodations, would it
18  specify that a medical student would be
19  agreeing to certain terms and conditions as
20  part of applying for accommodations?
21    A.   That's correct.  When you complete that
22  Request For Test Accommodations, you must
23  agree to the terms and conditions.
24    Q.   Do you have that on Ms. Lewis's

Page 128

1  application for accommodations?
2    A.   Yes, I do.  That is the one I am looking
3  at.
4    Q.   We would certainly like to see a copy of
5  that.
6        Does that document specify
7  which Bulletin of Information the student is
8  agreeing to?
9    A.   It has, again, the date and time --
10  excuse me, it has the date, and that would
11  tell you which Bulletin of Information you
12  were looking at.
13        The Bulletin of Information
14  is generally a document that is in place
15  between July and June of a year, an academic
16  year.  And that Bulletin of Information would
17  be referred back to.
18    Q.   And that Bulletin of Information would
19  be revised each July?  A new one would take
20  effect each July; is that right?
21    A.   Yes.
22    Q.   Are the terms and conditions actually
23  listed on the Application For Accommodations
24  or do you have to go somewhere to see them?

32 (Pages 125 to 128)

Joseph Flamini

Page 129

1  A.  It indicates right there that the terms
2  and conditions set forth in Bulletin of
3  Information, you would be able to click and go
4  to the website, which is very well organized
5  to easily read through the Bulletin of
6  Information, and it opens with the terms and
7  conditions.
8  Q.  And then the instructions provide
9  that -- can a student submit their Application
10  For Accommodations in paper through U.S. Mail
11  or is it only on the website?
12  A.  They can print it out and submit it
13  through U.S. Mail.
14  Q.  Where would they physically mail it to?
15  A.  At this time, they mail it to the
16  Conshohocken office.
17  Q.  If they submitted it via e-mail, what
18  e-mail would it go to?
19  A.  There is a special mailbox that is test
20  accommodations.  It would go to that.
21  Q.  Who manages that or responds to things
22  coming in through that test accommodations
23  e-mail?
24  A.  We have a manager of test accommodations

Page 130

1  who would look at that and manage that.
2  Q.  Who is that?
3  A.  His name today is Todd Mendelson.  Todd
4  Mendelson is our manager for test
5  accommodations.  In 2017, that would have been
6  a different individual.
7  Q.  Who would that have been in 2017?
8  A.  I have to get you that name to confirm.
9  Q.  The person you referenced who is
10  currently responding to the testing
11  accommodations e-mail, which office do they
12  work from?
13  A.  Works here in our Conshohocken office in
14  Pennsylvania.
15  Q.  What is your office called that manages
16  testing accommodations generally?  I don't
17  know if I am referring to it by the right
18  department name.
19  A.  Testing accommodations.
20  Q.  It's just called testing accommodations?
21  Where is that housed?
22  A.  Physically in the Conshohocken office on
23  the second floor.
24  Q.  When Ms. Lewis's Request For

Page 131

1  Accommodations were denied, what office did
2  those denials come from?
3  A.  Same office.
4  Q.  In Pennsylvania?
5  A.  Pennsylvania, yes.  Actually, in the
6  case of -- it depends on the timing of her
7  request, because she had requested over a
8  period of time, so it is possible that that
9  had altered over that time.
10      Let me take a quick look.
11      The most recent event for her
12  was in 2019.  That would have been here in
13  Conshohocken.  If I went back to 2017, that
14  would have been a different individual, and in
15  fact, would have been in our Chicago office at
16  that time.
17  Q.  The accommodations denials in 2019, in
18  October 2019, November 2019, and then in
19  March 2020, what office did those all come
20  from?
21  A.  I believe they were all Conshohocken,
22  Pennsylvania.
23  Q.  Who wrote those denials for the NBOME?
24  A.  Those denials are -- I mentioned his

Page 132

1  name -- Todd Mendelson would be organizing,
2  assembling that information.
3      You're talking about the
4  actual denial of accommodation letter?
5  Q.  Yes.
6  A.  Todd Mendelson would have organized
7  those letters?
8  Q.  Who would have written those letters,
9  signed those letters?
10  A.  Todd prepares the letters, drafts the
11  letters.  They are reviewed, depending on the
12  circumstances, with general counsel, Doug
13  Murray, depending on the circumstances, and
14  it's based on the results of the committee
15  meeting.
16  Q.  Is Mr. Murray authorized to practice law
17  in Indiana?
18  A.  No, not to my knowledge.
19  Q.  Looking at your executive committee of
20  the board, does anyone on the executive
21  committee of the board live or work in
22  Indiana?
23  A.  I would have to take a look at that list
24  and go through to see if anybody does, and

**33 (Pages 129 to 132)**

Joseph Flamini

Page 133

1    that executive board changes over time,
2    obviously.
3         I am not sure, to be honest.
4    I don't recall where they practice.  I can
5    tell you some of them I know are not, but I
6    couldn't say to you absolutely, somebody was
7    in Indiana.
8    Q.   Is Dr. David Kuo, K-U-O, on your
9    executive committee of the board right now?
10   A.   Dr. Kuo is a member of our executive
11   board.
12   Q.   Do you know where he lives?
13   A.   He practices in Pennsylvania in one of
14   our medical schools.
15   Q.   Are any of the individuals on the
16   NBOME's board of directors, are any of them
17   from Indiana?
18   A.   Possibly.  I could not state right off
19   the top of my head.  I would have to look at
20   the list and analyze it a little bit.
21   Q.   Is Dr. Richard Ortaski currently on your
22   board of directors?
23   A.   He is.
24   Q.   Do you know where he practices?

Page 134

1    A.   He practices at LECOM, the Lake Erie
2    College of Osteopathic Medicine.
3    Q.   Is that in Pennsylvania?
4    A.   It is.
5    Q.   The NBOME has a client services number.
6         If I give you the number,
7    could you tell me where that number is
8    answered?
9    A.   I can tell you what happens with that
10   number.  There are two numbers.  One is in the
11   Philadelphia area, and one is in Conshohocken,
12   but the answering of the phone depends on the
13   hunt sequence.  Somebody could dial a Chicago
14   number, a 773 area code, and somebody in
15   Conshohocken could answer it, depending on who
16   is available.
17   Q.   You testified earlier that if a student
18   had questions about the terms and conditions,
19   they could call the NBOME.
20        Would they be able to call
21   anyone in Indiana to ask those questions on
22   behalf of NBOME?
23   A.   The call would come through to client
24   services, and that clients services would

Page 135

1    refer the question for answer.
2         Quite frankly, if it was a
3    detailed question, we might tap resources up
4    to and including legal counsel like Syd to
5    participate -- help us make sure we answer it
6    properly.
7    Q.   Where are your exams graded?
8    A.   They are graded in both Pennsylvania and
9    in Chicago.  The computer-based exams are
10   graded in Chicago.
11   Q.   At what locations do you offer your
12   COMLEX 2-PE?
13   A.   COMLEX 2-PE is offered in the
14   Conshohocken office and our Chicago offices.
15   Q.   Is it offered anywhere else?
16   A.   Not at this time.
17   Q.   Turning back to Exhibit-2, please.
18   We're almost done.  Exhibit-2, I believe, is
19   the affidavit, Mr. Flamini, that you submitted
20   to your counsel -- submitted to the court
21   along with the Motion to Transfer.
22   A.   Are you referring to the declaration?
23   Q.   Yes.
24   A.   Give me a moment.

Page 136

1    Q.   You and me both.  Let me know when you
2    are ready.
3    A.   Got it.
4    Q.   Actually looking first at page -- the
5    first page of Exhibit-A, which looks to be
6    about the 9th page of the document, it says,
7    Terms and Conditions, at the top.
8         Is this the exact terms and
9    conditions that you contend Ms. Lewis saw and
10   consented to?
11   A.   Ms. Lewis saw and consented to a number
12   of times.  So I would need the exact -- which
13   date, which time, and I'd be able to tell you.
14        But I will tell you that
15   substantially, though, the answer is yes.
16   Things like the form selection clause have not
17   changed.  None of that has changed.
18   Q.   I notice that there is no date at the
19   bottom of this.
20        Was the date removed from
21   this document?
22   A.   I don't believe it was removed.
23   Q.   So looking at the Bulletin of
24   Information, which was Exhibit-3, if you look

Joseph Flamini

Page 137

1    at page 5 of that, where it says, Terms and
2    Conditions.
3            At the bottom, it has a date.
4    Why is it that Exhibit-A doesn't have a date
5    like the Bulletin of Information that we were
6    able to pull off the website?
7    A.   We organize the website very convenient
8    for our candidates to be able to pull copies
9    and to organize it, so that they can quickly
10   access information.
11           This document listed because
12   if somebody is printing it, we want to know
13   when they printed it.  If you brought this to
14   me and showed it to me, I would know when you
15   accessed it, what version it was.
16   Q.   Looking at Exhibit-A then of your
17   declaration, there is no way of knowing what
18   date, what version of the terms and conditions
19   this was, just looking at this page, is there?
20   A.   As you point out, just looking at this
21   page, that is correct.  Certainly, we could
22   provide you easily for any date and time the
23   exact terms and conditions that were agreed
24   to.

Page 138

1    Q.   Can you provide the terms and conditions
2    with Ms. Lewis's consent on it, on that
3    document or image?
4    A.   I can provide you the date, time, down
5    to the second, that she pushed the button that
6    said, I agree to terms and conditions.
7            I am not sure there is an
8    electronic document as you point out.  I can
9    provide you the actual time she did, down to
10   the second, that she pushed the button, down
11   to the software, but I don't know that there
12   is an image for every candidate that pushes
13   the button.
14   Q.   And for this specific Exhibit A of your
15   declaration, do you know what date these terms
16   and conditions were, this document is?
17   A.   I am not sure which one of her exams it
18   was.  Again, substantially, it has not changed
19   over the course of her times doing so.
20   Q.   Is this an example of what a medical
21   student might have signed or are you saying
22   that this is exactly what she signed?
23   A.   She signed seven times.
24   Q.   She signed what?

Page 139

1    A.   She agreed to the terms and conditions.
2    Q.   You testified that the terms and
3    conditions have changed, and that the Bulletin
4    of Information changes every July.
5            MR. STEELE:  That was not his
6    testimony.  You misstated it.  He hasn't said
7    the terms and conditions change.  He said the
8    Bulletin of Information changes?
9    BY MS. VARGAS:
10   Q.   I think we are all familiar with what
11   evidence is.  It's the actual thing that
12   somebody signed, whether electronic or not
13   electronic.
14           What I am asking is, is
15   Exhibit-A the actual evidence of what you
16   maintain Ms. Lewis signed?  Is her signature
17   on here somewhere?
18   A.   Obviously, it is not.  I don't see it
19   appear anywhere.  I can tell you that the
20   system captures the date and time that she
21   agrees to this document.
22   Q.   How does it capture that?
23   A.   The same way that if you purchase
24   something on Amazon, it captures your time

Page 140

1    that you agree to purchase the item.  The
2    software records the moment it happens.
3            And you're unable to proceed
4    unless you do agree.  You're unable to
5    proceed.  She would have never purchased an
6    examination unless she had agreed.  It is
7    impossible to do so.
8    Q.   So she didn't have a choice not to
9    agree, then?
10   A.   She certainly has a choice.  She can
11   make a decision what she wants to do.  But for
12   her to proceed in the process of either
13   registering or purchasing the exam, she must
14   agree.
15   Q.   Turning to Exhibit-B of your
16   declaration, starting at page 11 of 19, we
17   talked about this page a little bit before.
18           This is not -- just to make
19   sure I understand what this is, page 11 is not
20   the exact screenshot that Ms. Lewis saw.  This
21   is an example of what a student might have
22   seen with some commentary and colors and
23   arrows added by NBOME?
24   A.   Exactly.  This is a screenshot of what a

35 (Pages 137 to 140)

Joseph Flamini

Page 141

1  student sees when they register, not Sharmaine
2  Lewis.
3      Q.   And then turning to page 12 of 19,
4  again, is this the actual screen that Ms.
5  Lewis saw, or is it an example of what a
6  student might see today if they registered for
7  the exam?
8      A.   This is an example of what Sharmaine
9  Lewis would have seen.
10     Q.   When you say that she saw this, would it
11  have had these red arrows on it?
12     A.   No, these are enhancements to describe
13  to you what she is doing.
14     Q.   Who provided the enhancements to this
15  document?
16     A.   I think this whole series of screenshots
17  were provided by our AVP for IT, our IT
18  director, who pulled this information for us.
19         I subsequently went through
20  personally the same process to make sure that
21  I saw myself what a candidate goes through,
22  just to confirm these, and I find them all to
23  be completely accurate.
24     Q.   Did you go through what a candidate

Page 142

1  would have seen, say, in 2017?
2      A.   I went through our portal, and our
3  portal has not changed any substantial matter
4  over these past few years.  The portal is
5  similar.  The portal is used when a candidate
6  either registers or purchases an exam.
7      Q.   So you brought up the example of if I
8  were to go onto Amazon and purchase something.
9         If I were to go onto Amazon
10  and purchase something, I could then go into
11  my account and print out the exact order that
12  I had, and how much I agreed to pay, and there
13  is a receipt, and that is all specific to me.
14         As I am understanding what
15  Exhibit-B is, all of Exhibit-B, is it accurate
16  to say that Exhibit-B is not specific to Ms.
17  Lewis, it is what a medical student might have
18  seen in 2020 with enhancements?
19     A.   That's correct.  You would want to go to
20  our attachment -- excuse me -- Exhibit -- I
21  think for this deposition -- 6, it was?
22         That would be analogous to
23  what you just suggested.  It would show all of
24  her purchases for Sharmaine Lewis.  That was

Page 143

1  that document we looked at a few minutes ago.
2      Q.   Looking on page 13 of 19, was this
3  document enhanced in any way, or is this how a
4  medical student in 2020 might have seen their
5  screen appear when they registered?
6      A.   I am looking at it.  I don't see -- I
7  think we did shrink it down to fit the page
8  for you.  There might have been a little bit
9  more information.  This is her shopping cart.
10     Q.   Is this her shopping cart or is this a
11  generic shopping cart that someone generated
12  for the purpose of litigation?
13     A.   It is a generic shopping cart to
14  demonstrate to you that it was impossible for
15  Sharmaine Lewis not to proceed through the
16  process without agreeing to the terms and
17  conditions.
18     Q.   Where it says, Shopping Cart, displayed
19  at the top, was that added to this?
20     A.   That's correct.  That was added, that
21  comment at the top.  I am speaking for
22  everything NBOME down.
23     Q.   Looking at page 14 then, I see two
24  arrows.

Page 144

1          Are those arrows enhancements
2  that were added for purposes of litigation?
3      A.   These are enhancements to help you
4  understand what we were displaying for you.
5          So you see the first arrow
6  shows an error occurred.  The candidate is
7  trying to proceed to payment, and the error
8  says, you cannot proceed to payment without
9  clicking View Terms and Conditions.
10     Q.   So where it says, must click this link
11  to be taken to the terms and conditions page,
12  is that something that actually appears on the
13  screen?
14     A.   It is not.  That is an enhancement to
15  describe to you.
16          Up above though, where it
17  says, one error occurred.  To purchase COMLEX
18  examinations, you must agree to the terms and
19  conditions by clicking on the link.
20          The arrows were added, and
21  that description down at the bottom was added,
22  but that error message is an actual error
23  message.
24     Q.   Is it accurate to say that Ms. Lewis

**36 (Pages 141 to 144)**

Joseph Flamini

Page 145

1   never saw page 14 as it appears in your
2   declaration?
3   A.   Ms. Lewis never saw page 14 in the
4   declaration with the arrows added.  She did
5   see a page that had everything else on it when
6   she went through her process.
7   Q.   How do you know that she saw a page that
8   looked like this?
9   A.   Because the software -- the series of
10  pages we're showing you is software -- the way
11  it displays to a candidate as they walk
12  through the process.
13         Which is why I personally
14  went back in to say, let me experience it
15  myself and make sure I understood the process,
16  but I wanted to do it myself, which I did.
17         And I went through each of
18  these steps myself, so I know that she had to
19  go through these steps in order to accomplish
20  what shows up on her transaction sheet that
21  she purchased an exam, and she registered.
22  Q.   What date did you do that?
23  A.   I did that in the last week.
24  Q.   Looking at page 15, this is not the

Page 146

1   screen Ms. Lewis saw in 2017, is it?
2   A.   She would not have seen this screen,
3   because it has enhancements on it.
4   Q.   Is the same true of page 16?
5   A.   From the logo down, NBOME down, this is
6   what you see.  If she had clicked on View
7   Terms and Conditions, this is what she would
8   have seen, from the NBOME logo down.
9          Certainly, she would not have
10  seen the case number, obviously, nor would she
11  have seen this is the terms and conditions
12  that is displayed.
13         Everything else, there are no
14  additions to it.  You see the buttons at the
15  bottom, agree or disagree.
16  Q.   Looking at page 16, what was the date
17  this screenshot was taken?
18  A.   This screenshot was taken during the
19  past two months.
20  Q.   Page 17?  Are there enhancements on
21  page 17 from what Ms. Lewis or what you
22  maintain Ms. Lewis would have seen?
23  A.   Again, from the logo down, I don't see
24  any enhancements, so if Ms. Lewis was to go

Page 147

1   and purchase the exam, which she did, she
2   would have seen this page.
3   Q.   Page 18, has the NBOME altered the
4   screenshot from 2020 in order to enhance this
5   page?
6   A.   We enhanced it by adding that little
7   arrow at the bottom to make sure you saw the
8   agree to terms.
9   Q.   The language across the top?  Is that
10  something that was added?
11  A.   She would not have seen anything across
12  the top below the NBOME logo.
13  Q.   Who wrote the language across the top?
14  A.   That would have been Steve Basile, who
15  was providing us this series of images just to
16  describe what he was showing us.
17  Q.   And is that your IT person?
18  A.   That is my assistant vice president for
19  IT.
20  Q.   Did he do this for purposes of the Lewis
21  litigation?
22  A.   He did.
23  Q.   Going to page 19, again, this is not a
24  screenshot of what Ms. Lewis saw, is it?

Page 148

1   A.   Not with the enhanced arrows or
2   description at lower bottom.  Everything above
3   the NBOME logo would not have been there, and
4   the arrows would not have been there nor that
5   description.  What is important on this
6   document is you see the word, view terms, has
7   changed to agreed, and that would allow Ms.
8   Lewis to proceed to payment.
9          MS. VARGAS:  I would like to
10  take a very quick break.  Like two minutes.
11         - - -
12  (Whereupon a short break was taken at this
13         time.)
14         - - -
15  BY MS. VARGAS:
16  Q.   Mr. Flamini, I am almost done.  I wanted
17  to look again at what I am screen sharing,
18  which is page 11 of 19.  It is part of
19  Exhibit-B from your declaration that you
20  submitted to the court.
21         Looking at this page, do you
22  see where it says, name?
23  A.   Yes, okay.
24  Q.   What name does it have?

**37 (Pages 145 to 148)**

Joseph Flamini

Page 149

1    A.   Steve.
2    Q.   It does not have Ms. Lewis's name
3    anywhere on this document; does it?
4    A.   That's correct.
5    Q.   Where it says, gender, what gender is
6    selected.
7    A.   I don't see it, but if you highlight
8    it --
9         It says male.
10   Q.   Is any of Ms. Lewis's information on
11   this document?
12   A.   I do not believe so.
13   Q.   Does the NBOME have a screenshot of this
14   document with Ms. Lewis's information on it?
15   A.   We would be able to pull for you the
16   information that she supplied.  I am not sure
17   if it can be presented as a screenshot, but we
18   certainly can provide you all of the same
19   information, her ID number, her name, gender,
20   etc.
21   Q.   I am not asking for that information.
22        I am asking, does the NBOME
23   have an image, a picture, a screenshot?  In
24   any way, has the NBOME retained this -- what

Page 150

1    we're seeing on page 11 as Ms. Lewis filled it
2    out, as opposed to Steve?
3    A.   Yeah, as you describe it, a screenshot
4    is a moment in time that somebody takes the
5    image.
6         We do not save individual
7    images.  This does represent the process she
8    went through and had to go through in order to
9    register and take the exam -- and representing
10   that she had to accept the terms and
11   conditions, had to agree to the terms and
12   conditions each time.
13        MS. VARGAS:  I don't have any
14   further questions at this time.
15        - - -
16        EXAMINATION
17        - - -
18   BY MR. STEELE:
19   Q.   A few questions, Mr. Flamini.
20        Exhibit-B that is pulled up
21   here, what is the purpose of attaching this
22   Exhibit-B to your declaration?
23   A.   It is to demonstrate that a candidate
24   cannot register nor schedule an examination

Page 151

1    without agreeing to the terms and conditions.
2    Q.   This is not intended to be Ms. Lewis's
3    screenshot as she actually saw it with the
4    names and all that sort with her name on it?
5    A.   That's correct.
6    Q.   But nonetheless, looking at Exhibit-B on
7    page 11, the first page there, what, in fact,
8    did Ms. Lewis see when she went on the
9    registration system to register for the exam?
10        MS. VARGAS:  I'm going to
11   object, for the record, to foundation.
12        THE WITNESS:  Ms. Lewis saw
13   an identical page with the exception of that
14   special note that has been added most recently
15   for COVID, Ms. Lewis would have seen the same
16   page with the tabs across the top --
17        MR. STEELE:  My Internet
18   connection is unstable, it says.  Did you get
19   that testimony, Madam Reporter?
20        COURT REPORTER:  It was cut
21   off.
22        MR. STEELE:  Would you read
23   the question again.
24        - - -

Page 152

1    (Whereupon the Court Reporter read back the
2    testimony.)
3         - - -
4         THE WITNESS:  What I was
5    saying is, with the exception of the special
6    note that was added concerning COVID, she
7    would not have seen that.
8         And she certainly did not see
9    the arrow or the explanation to describe what
10   this document is.
11        But she did see all of the
12   other fields and information she had the tabs
13   across the top to select from.
14   BY MR. STEELE:
15   Q.   What was the purpose of putting the
16   arrow in the comments, with the arrow on this
17   Exhibit-B?
18   A.   That was to help all who were viewing it
19   understand what this document means.
20        And in this case, the tab
21   showed that the candidate had the opportunity
22   to register for the exam.
23   Q.   On the next page, page 12, what, in
24   fact, did Ms. Lewis see when she went in to

38 (Pages 149 to 152)

Joseph Flamini

Page 153

1　register for the exam, the multiple times for
2　the Level 2-CE exam and the Level 1 exam?
3　A.　Again, she would not have seen the
4　arrows or the explanation.  The explanation is
5　telling us that placing a check mark in the
6　exam is adding it to your cart.  It describes
7　how the candidate would have used this page.
8　　　　　But this page, other than
9　those arrows and that explanation, is what
10　Sharmaine Lewis would have seen.  She would
11　have clicked on Level 1 exam and added it to
12　her cart.
13　Q.　The same question with regard to
14　page 13, what in fact would Ms. Lewis have
15　seen when she registered to take the COMLEX
16　exam?
17　　　　　MS. VARGAS:  Objection to all
18　of these questions as they relate to the
19　foundation, and Mr. Flamini is offering
20　testimony about what somebody else saw.  I
21　would just leave that objection standing, so I
22　don't have to interrupt this line of
23　questioning.
24　　　　　MR. STEELE:  I'm asking what

Page 154

1　did Ms. Lewis see when she viewed this
2　screenshot.
3　　　　　MS. VARGAS:  That is what I
4　am objecting to, to be clear, and I maintain
5　that objection to this line of questioning to
6　the extent that you're asking Mr. Flamini to
7　testify as to what another human being saw.
8　　　　　THE WITNESS:  Based on my
9　knowledge of our portal system, the client
10　service registration system, the way it is
11　programmed, the way it functions, my
12　experience looking at that document
13　personally, I can say that Ms. Lewis would
14　have seen this page, her shopping cart, and
15　she would have had the decision to make on
16　proceeding to payment for her examination.
17　BY MR. STEELE:
18　Q.　Is that true for all of the screenshots
19　that are part of Exhibit-B of Exhibit-2?
20　A.　Yes, it is.
21　Q.　Looking at page 14 of this exhibit,
22　what, in fact, did Ms. Lewis see when she went
23　in to register for the COMLEX USA exams?
24　A.　Ms. Lewis would not have seen the

Page 155

1　arrows, would not have seen the description at
2　the bottom.  She would have seen everything
3　below NBOME, and in her case, if she attempted
4　to move forward without viewing the terms and
5　conditions, she would have seen the error
6　message that appeared there.
7　Q.　How do you know that?
8　A.　I personally went through and tested the
9　system myself after querying my IT staff, my
10　IT leadership, to confirm for me how it works.
11　　　　　Once that was all done, I
12　went into the system and did it personally,
13　and I tried it different ways and attempted to
14　go in different ways, and I experienced what
15　Ms. Lewis would have experienced, the
16　inability to proceed without agreeing to
17　terms.
18　Q.　What we see here with the enhancements
19　for purposes of explanation added only, would
20　this have been true when Ms. Lewis looked at
21　the screen to register for COMLEX exams?
22　A.　To clarify, you said, without the
23　enhancements?
24　Q.　Without the enhancements.

Page 156

1　A.　This is what Ms. Lewis would have seen,
2　when she went to the page, in this case the
3　shopping cart page on page 14, this is exactly
4　what she would have seen.
5　Q.　Turning to page 15, what exactly did
6　Ms. Lewis see when she went in to register for
7　COMLEX exams?
8　A.　In this case, you see the arrow.  That
9　would not have been there.  Clicking on view
10　terms.  That would not have been there.  This
11　was all the opportunity to explain to folks
12　what this page means.  Everything from the
13　logo down otherwise, she would have seen.  She
14　would have seen the ability to proceed to
15　payment.
16　　　　　And after she viewed terms.
17　You cannot proceed to payment when it says,
18　view terms, because it means you have not yet
19　taken that opportunity to review the terms and
20　conditions.
21　Q.　And those terms and conditions that --
22　when Ms. Lewis clicked upon view terms,
23　looking at Bates-16, is that what she would
24　have seen?

Joseph Flamini

Page 157

1    A.   That is correct.  That page pops up, and
2    she gets the opportunity to see all 13 items
3    that are displayed on page 16 and has the
4    opportunity to click on agree to terms.
5    Q.   She had a choice of either agree to
6    terms or to disagree to terms?
7    A.   That's correct.
8    Q.   If she clicked disagree to terms, what
9    would have happened?
10   A.   She would have come back to the page,
11   and it would have said, view terms, again.
12        As it notes at the top there,
13   if a candidate clicks on disagree to terms,
14   they are taken back to the shopping cart, as
15   you see it here, and the view terms is still
16   displayed.  You cannot proceed.
17   Q.   If she had clicked agreed to terms, what
18   would have happened?
19   A.   I believe that is what is displayed on
20   page 19.  The word would have changed under
21   view terms.  That changes to agreed.
22   Q.   So she would have known that she agreed
23   to the terms before she could proceed and
24   purchase the exam?

Page 158

1    A.   Clearly, yes.
2    Q.   This happened multiple times; is that
3    correct?
4         Looking at Exhibit-A of your
5    declaration -- do you have that?
6    A.   Yes.
7    Q.   With regard to the COMLEX Level 2-CE
8    exams that Ms. Lewis purchased in 2018 and
9    2019, is it possible for Ms. Lewis to have
10   purchased those exams, registered for those
11   exams, without agreeing to the terms and
12   conditions that are on Exhibit-A?
13   A.   That is not possible.  She had to agree
14   to these terms and conditions.
15   Q.   Based upon your background, your
16   knowledge, of the systems of the NBOME, the
17   people that work for you, did Ms. Lewis agree
18   to these terms and conditions that are marked
19   as Exhibit-A each time she registered to take
20   the COMLEX Level 2-CE exam?
21   A.   Yes, she had to agree to these terms and
22   conditions.  She did agree to these terms and
23   conditions.
24   Q.   You were asked by Counsel whether or not

Page 159

1    the NBOME may have required the student to
2    take the COMLEX 2-CE to graduate.
3         Does NBOME determine what is
4    required for graduation or is that by the
5    school or somebody else?
6    A.   It's a good point.  It's actually not
7    our decision at all.  It is up to the college
8    of osteopathic medicine to make that
9    determination.  We make the exam available to
10   them.
11   Q.   Did you receive any objections or any
12   inquiries whatsoever from Ms. Lewis, the
13   plaintiff in this case, at any time regarding
14   the terms and conditions that she agreed to,
15   that she had to agree to, and did, in fact,
16   agree to?
17   A.   We received no such request from
18   Sharmaine Lewis.
19   Q.   If you would look at Exhibit-6, I
20   believe it is -- that's the screenshot of her
21   history.
22        Do you have that?
23   A.   I have it in front of me.
24   Q.   With regard to those dates that are on

Page 160

1    there, each time that Ms. Lewis, the
2    plaintiff, registered to take the exam, is
3    that what is under request, create date?
4    A.   That's correct.
5    Q.   And each time that she requested the
6    exam, is that when she would have to go
7    through the CRS system to register for the
8    exam?
9    A.   To register and/or to purchase an actual
10   examination.
11   Q.   To do that, she had to agree to the
12   terms and conditions that is marked as
13   Exhibit-A without before she could proceed.
14   A.   It is impossible for her to proceed
15   without agreeing to those terms and
16   conditions.
17   Q.   This question is related to the board of
18   directors.
19        Isn't it true, Mr. Flamini,
20   that the board of directors of NBOME are
21   located all over the country?
22   A.   Yes, it is.
23   Q.   Not just in Pennsylvania?
24   A.   Not just in Pennsylvania, not in

**40 (Pages 157 to 160)**

Joseph Flamini

Page 161

1  Illinois, they come from all over the country.
2  Q.   How long has the NBOME been incorporated
3  in the State of Indiana?
4  A.   At least the last few decades, and I
5  know the origins go back to 1934, maybe as far
6  as back as that.
7        MR. STEELE:  Thank you, Mr.
8  Flamini.  That is all of the questions I have.
9        MS. VARGAS:  I have a
10  follow-up on that, Mr. Flamini.
11        - - -
12        EXAMINATION
13        - - -
14  BY MS. VARGAS:
15  Q.   Aside from the NBOME's outside counsel,
16  Mr. Steele, does the NBOME have anything else
17  in Indiana?
18  A.   Not to the best of my knowledge.
19        MS. VARGAS:  Thank you.
20        COURT REPORTER:  Would
21  Counsel like a copy of the transcript.
22        MR. STEELE:  Let me get back
23  to you on that.  I will get back to you.  I
24  have your e-mail.

Page 162

1        MR. WEINER:  How soon can we
2  get it?
3        COURT REPORTER:  Monday.
4        - - -
5        (Whereupon the deposition
6  concluded at 2:30 p.m.)
7        - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 163

1       Read your deposition over carefully.  It is
2  your right to read your deposition and make
3  changes in form or substance.  You should
4  assign a reason in the appropriate column on
5  the errata sheet for any change made.   After
6  making any change in form or substance which
7  has been noted on the following errata sheet
8  along with the reason for any change, sign
9  your name on the errata sheet and date it.
10  Then sign your deposition at the end of your
11  testimony in the space provided.  You are
12  signing it subject to the changes you have
13  made in the errata sheet, which will be
14  attached to the deposition before filing.  You
15  must sign it in front of a witness.  Have the
16  witness sign in the space provided.  The
17  witness need not be a notary public.  Any
18  competent adult may witness your signature.
19  Return the original errata sheet & transcript
20  to deposing attorney, (attorney asking
21  questions) promptly.  Court rules require
22  filing within 30 days after you receive the
23  deposition.  Thank you.
24

Page 164

1        C E R T I F I C A T E
2        - - -
3        I, Jeannine Cancelliere, Court
4  Reporter and Notary Public and for
5  Philadelphia, Pennsylvania, do hereby certify
6  that the foregoing testimony of JOSEPH
7  FLAMINI, was taken before me via Zoom on
8  Tuesday, November 10, 2020; that the foregoing
9  testimony was taken by me in shorthand by
10  myself and reduced to typing under my
11  direction and control, that the foregoing
12  pages contain a true and correct transcription
13  of all of the testimony of said witness.
14
15
16        .............
         JEANNINE CANCELLIERE
17        Notary Public
         My commission expires
18        October 13, 2023
19
20
21
22
23
24